Case number 23-1041 and 23-1044, USA v. Dennis Cartwright Jr., argument not to exceed 20 minutes per side. Ms. Salinas, Mr. Shruler, and Mr. Weiner, you may proceed with the appellate. Thank you. Good afternoon. My name is Melissa Salinas. I'm the supervising attorney from the University of Michigan Law School. We'd like to thank you for allowing the students to argue the case. Thank you. You are Mr. Shruler? That's correct, Your Honor. Thank you. Good afternoon, Your Honors, and may it please the court. My name is Jordan Shruler, and I represent the defendant appellant, Mr. Dennis Cartwright. I would like to reserve three minutes for rebuttal. Before I begin, I will be highlighting the continuance and the exhibits issue from the narcotics case, and my co-counsel, Matthew Weiner, will be highlighting the hearsay issue from the narcotics case and the remaining issues from Mr. Cartwright's PPP case. It is foundational to our criminal justice system that every defendant have the evidence presented against him fairly with adequate time to prepare his defense. From the outset of Mr. Cartwright's trial, the court strayed from that fundamental principle, allowing the government to present its evidence in the manner and on the timeline it saw fit without regard to the prejudicial effect on Mr. Cartwright. For the reasons we discussed today, as well as the remaining reasons in our brief, we ask this court to vacate Mr. Cartwright's conviction and sentence and remand for further consistent proceedings. First, the court abused its discretion in failing to grant a justifiable and necessary continuance to Mr. Cartwright. Mr. Cartwright's trial counsel described the government's strategy leading up to trial as, quote, trial by ambush. The government filed a third superseding indictment with substantively new charges 25 days before trial. In the days leading up to trial, the government provided Mr. Cartwright's trial counsel with gigabytes of data. And on just the day before trial, the government chose to bring a motion limiting prospective defenses to those new charges. The court abuses its discretion when there is an unreasoning and arbitrary insistence on expeditiousness, when there is a justifiable request for delay, and there was actual prejudice. Now, there have been some continuances before the superseding indictment was filed that had been requested by Mr. Cartwright, am I correct? Or by his attorney? That's correct, Your Honor. Maybe three of those, and the court had granted those. Yes, Your Honor. Okay. And it was like, what, about two years from the, two and a half years from the initial indictment to trial, so this case wasn't one that like rushed to trial. I mean, there was, you know, two, two and a half years before it actually got to trial. So you're talking really about a fourth request for continuance. That's correct, Your Honor. But if we look to those prior requests for continuances, and those are in documents 80, 177, and 240, all of them cited a need for continuance to review an overwhelming amount of discovery. So while there were previous requests for continuance, all of those were emblematic of the same problem. And once again, in the very days leading up to trial, there was a choice made by the government to provide this data and make this motion so close to trial. And given that timeline, and given the same behavior as we'd seen with the prior continuances, there was a justifiable request here. And it was necessary, and it actually prejudiced Mr. Cartwright to deny that continuance, because as Garner tells us, the continuance would have made a relevant witness available or added to his defense, and it would have done so in four different ways. Mr. Cartwright's trial counsel was a solo practitioner and stated in his motion to dismiss the third superseding indictment that he did not have time to, one, review the evidence, two, fully prepare his defenses, not just on the new charges, but for the entirety of Mr. Cartwright's trial. And that raises the same kind of issue as in Garner and in Wersing. Third, he was unable to fully and adequately respond to the government's motion in Lemonet. And fourth and finally, he was not able to prepare and present testimony from an expert forensic accountant, Doug Zandastra, and during the pretrial conference, he specifically cited that it was the issues with this data that made him unable to fully prepare and present his expert witness, and he wasn't ultimately able to put that witness on at trial. I'm under the impression that some of the late produced evidence was duplicative of earlier produced evidence, and I'm not seeing an effort to be specific about what particular documents were new and how that specific category of documents affected the case. Your Honor, the government relies on Warshak for that proposition that because data is duplicative, that doesn't actually prejudice the defense. But as Mr. Cartwright's counsel tells us, there were gigabytes of data. The government doesn't dispute that characterization. They acknowledge both on the record below and in their brief that there were replacements and revisions of exhibits, and every one of those exhibits was important to Mr. Cartwright's trial and to his defense and to the testimony that he intended. Well, we don't have the exact number that was new, Your Honor. We do know that there were replacements and revisions, and even if it was just replacements and revisions as the government acknowledges, it might have been some numbers. It might have been some phone numbers. It's still a significant undertaking for Mr. Cartwright's counsel to have to determine what is new, what is old, what is changed, and what is different, in addition to the new data and the new pages that he had asked for that he also had to review just before trial. And in a close case where Mr. Cartwright was acquitted on some charges and convicted on others, we wouldn't be able to say that there wasn't prejudice or that there was harmless error here. And similarly, there was no- You haven't cited any new information that your client didn't have previously. So it's just the time. It's just the fact that the lawyer had to look at this information. That was the prejudice? Yes, Your Honor. There was prejudice from not being able to look at that information, and again, from not- even though it wasn't- basically it wasn't new information. There was new information, Your Honor, and the government stated that there was new information. Tell me you didn't know whether there was- I thought you just said earlier that you didn't know whether there was new information or not. You had not- you had not nailed that down. You've obviously had a long time with the case. And apologies, Your Honor. I may have misspoken. We know there was new data. We don't have precisely what that new data was, but both government and trial counsel- Even today, you don't know. Today- I mean, it doesn't sound like the data was that important if even today when you're arguing to us, you can't tell us what that data was that was so critical to the trial. So it's just- it just feels like it's the burden that there was a lot of information given, but there wasn't some silver bullet there that your counsel missed because of the late dump. So unfortunately, Your Honor, trial counsel passed away this past summer, and we were able to collect some of the exhibits from his receiver, but we weren't able to look through each and every exhibit as much as we would have liked to because we did not have access to them. But we do know that some of that data was new and was relevant- During trial, did he make an objection at some point to say this information was being introduced as information that was never given to me until the day before trial? Yes, Your Honor. He said so on the record below, on the first day of trial, he made that objection. Well, did he make- anything said at a later point when he had more opportunity to review what was produced just before trial in order to make a more complete or perhaps persuasive argument about why there was prejudice? At later points, Your Honor, and that transitions nicely to the second issue, trial counsel raises a number of issues with the summary exhibits that the government presented, and that ties directly to the data that Mr. Green and his expert and others associated with Mr. Cartwright's case would have been able to review. Rule 1006 tells us that summary exhibits must be accurate and non-prejudicial, they must not be embellished or annotated with conclusions from highlighting techniques or otherwise, that comes from Bray and Scales. And Eunice tells us that a summary exhibit can consolidate but must not modify the underlying information. And the three summary exhibits, or at least three of the summary exhibits that the government presents here, raised those exact kind of prejudicial issues. First, for the call chart, to which Mr. Cartwright's counsel made a strenuous objection that placed him in a red box highlighted at the top of a chart that portrayed him as the leader of a conspiracy, which was not something the government had the evidence to present or did present. And then in their transaction. They didn't argue he was the leader, right? No, they did not, Your Honor, but it was. It was like an inference that would have been drawn even though they didn't argue the point? Yes, Your Honor, that's correct. They convicted him as a leader even though the government didn't ask him to be found as a leader? The government didn't ask him to be found that, Your Honor, but the exhibit depicted him as such and made that. The three individuals are arranged in a triangular sort of arrangement, and he's at the top. He's at the top. The three remaining individuals are below, and the explanation. That's where you would have to draw the inference that he was portrayed as the leader, though. It's simply his placement on a piece of paper that contains the heads of other individuals, right? It was that and the highlighting technique, Your Honor, and that runs headlong into Bray. And the explanation the government gave at trial was that he was the only one that was in contact with the other three individuals depicted on the chart. But that wasn't true. There had been another individual on the chart that was in contact with all of the other individuals depicted. And so there was no probative reason to organize the chart in that precise way, and it could only have been intended to have that implication about Mr. Cartwright's role in the alleged drug conspiracy. Even if that exhibit should not have been omitted for purposes of argument, there's so much other evidence. Is there not of guilt here? I mean, you've got all these recordings. You've got this video that the one gentleman made. I mean, how do you respond that this would just be harmless error if it is? Your Honor, Asher tells us that error is only harmless if the record evidence of guilt is so overwhelming that it eliminates any fair assurance that the conviction was substantially swayed by the error. This was a close case, again, in which Mr. Cartwright was convicted of some charges, was acquitted of other charges. And so if in another trial where the exhibits were presented fairly and counsel had full opportunity to prepare his defense, it just takes one juror to find reasonable doubt that Mr. Cartwright was innocent to have a hung jury. And given the closeness of this case, we can't say that these exhibits were harmless error. I think your time is up, and I believe we're on to your co-counsel. Thank you, Your Honors. Good afternoon, Your Honors, and may it please the Court. My name is Matthew Weiner. I'll be speaking first about the hearsay issue at the narcotics trial and then about the PPP case that Mr. Cartwright pled guilty in. At trial, Mr. Cartwright repeatedly submitted and the district court repeatedly excluded a recording that the government itself collected despite the court admitting more than 30 other recordings that were similarly collected when the government offered them. A government witness also made speculative conclusions about the very subject matter of this excluded recording. Therefore, the recording was properly submitted as impeachment evidence and was reliable. DEA agent Gadis told the jury that she had concluded that a meeting discussed in this excluded recording was to exchange narcotics proceeds. This is in spite of the fact that she had herself reviewed the wiretaps in which Mr. Cartwright and Mr. Johnson had discussed the purpose of this meeting. Therefore, Mr. Cartwright sought to use this recording to call into question the evidence that agent Gadis was relying on in making her conclusion. And this court has found that this exact purpose is admissible as impeachment evidence and that by testifying inconsistently with evidence in her possession, agent Gadis invited this form of impeachment. And that's U.S. version. What was inconsistent? So the conversation is this conversation where one of them's in Arizona, one of them's in Michigan, I think. They're talking about someone's lost their sunglasses and they have to return the sunglasses and that they're going to meet for that purpose rather than to deal drugs? Yes, Your Honor. That is the purpose that was discussed by Mr. Cartwright and Mr. Johnson. And it is inconsistent because while the government witness may present her conclusions about what she believed happened, she's not free to paint one picture and then prevent Mr. Cartwright from simply demonstrating that she may be ignoring the most relevant evidence or maybe presenting an untrue belief to the jury. I mean, she didn't say anything about the sunglasses. She just said they met at Home Depot and they met somewhere else, right? And she just testified about recordings. That is correct, Your Honor. And that indicated that they had met at Home Depot and there was somewhere else they met, I forget. And there was no discussion about sunglasses. Just didn't come up. That is correct, Your Honor. So while on the recording, Mr. Cartwright and Mr. Johnson discussed meeting at Home Depot to exchange sunglasses, Agent Gaddis told the jury that she believed they were meeting at that Home Depot to exchange narcotics proceeds. So while she exactly didn't discuss sunglasses, she instead made a different conclusion. And Mr. Cartwright sought only to demonstrate that she may be ignoring evidence that they were not meeting for an unlawful purpose. Did the recording have a time and place? Did they say they were going to meet a certain day at Home Depot or was it just sort of general discussions? They didn't have a specific plan on the recording, right? Your Honor, they made the specific plan to meet at Home Depot in the coming days, which it was in the next two or three days after the recording. And this not only may have caused the jury to doubt her conclusion in this specific question, but may have caused them to doubt her credibility more generally as she made several conclusions about the contents of different wiretap recordings throughout her testimony. However, even if not for impeachment purposes, this recording fell under several exceptions to the hearsay rule. I'll speak briefly about one of them, Rule 807's residual exception. But the prosecution itself relied upon the accuracy and reliability of these wiretaps throughout their case in chief. They allowed their witnesses to testify as if the contents of these wiretaps were fact and continue to treat contents of other wiretaps as if they're fact to this day. So they made no indication of unreliability of these statements on the recording, which is why they would fall under Rule 807. And as the government's arguments about the notice requirement of 807 are unfounded because the government had the recording for more than a year and a half prior to trial and itself collected them, this recording does fall within the structure of Rule 807. I would move now to the second case on appeal here today. In relation to a scheme to fraudulently obtain PPP loans, Mr. Cartwright pled guilty to having deposited a check for $15,000 from a Mr. David Kurbanov. Mr. Cartwright's sentence then calculated his restitution as $329,000, 22 times the amount contained in the plea agreement. Mr. Cartwright's guilty plea is invalid because a guilty plea must be made knowingly, voluntarily, and intelligently, and here it was not. Per Brady v. United States, in order to be knowing, intelligent, and voluntary, the defendant must be sufficiently aware of the relevant circumstances and likely consequences of his plea. The government instead suggests that a plea agreement must merely indicate the court's restitution per Rule 11 in order for the plea to be knowing, intelligent, and voluntary. However, Rule 11 is meant to aid the voluntariness inquiry, not replace it, and McCarthy v. United States makes that clear in the very sentence that establishes that failure to comply with Rule 11 is itself grounds for invalidating a plea. The court says that the rule- Your point is the plea itself has to identify the exact amount of restitution? No, Your Honor. It's not our belief that it has to establish the exact amount, but it must make the defendant aware of the likely consequences. And we do not believe- I mean, he knows the offense he's pleading guilty to. He knows there can be financial ramifications to that. That's correct, Your Honor. But in other cases, this court has found that when the plea is ambiguous as to the amount of restitution or the manner for determining what the restitution amount will be, that is not satisfactory. The word restitution itself is not a talisman for validity, and simply stating that some restitution may be ordered does not mean that any amount ordered later is then knowing, voluntary, and intelligent. Additionally, there are three other reasons why we believe that the totality of the circumstances suggests that Mr. Carver was not aware of the relevant circumstances and likely consequences of his plea. It appears that much of the amount contributing to this restitution order came from counts outside of Count 8, which were dismissed via the plea agreement. And while the plea agreement says that the dismissed charges may be used for the sentence guideline calculations, it does not say that it can be used for the restitution amount. Additionally- The amount was in the PSR, correct? The exact amount was in the PSR? There are many different aspects of the scheme in the PSR that relate to other of his co-defendants. And the only amount stated as to what he, that he pled guilty to that he was responsible for is this $15,000 check that he deposited from Mr. David Karbanov relating to illicit transactions. Additionally, at the sentencing hearing, when he expressed confusion about different aspects of his sentence, the court repeatedly characterized the PPK the separate case as a bonus and said that it did not really affect him, which downplayed the severity of the consequences which evidently are vast for him. And finally, we would say this is not a case where the government or the court were not capable of determining what the restitution amount would be. We know that because one of Mr. Cartwright's co-defendants, which was, which was sentenced before Mr. Cartwright, his plea agreement states the exact amount to be paid. So this was information that was in the government's possession at the time that they entered into the plea agreement or shortly thereafter with Mr. Cartwright and that could have been amended to reflect that and to give him a greater sense of what the plea agreement would lead to the likely consequences down the road. For all those reasons, we feel it is clear that the plea agreement here did not make Mr. Cartwright sufficiently aware of the relevant circumstances and likely consequences of his plea and therefore the plea agreement itself was invalid. And we believe that that should be vacated and remanded so that he can plead anew. Thank you. Mr. Hakes, is that right? That's correct, Your Honor. Good afternoon and may it please the court. My name is Austin Hakes and I represent the United States Attorney's Office for the Western District of Michigan. Both of Mr. Cartwright's attorneys did a very effective job and the government's pretrial discovery process was completely normal. That is not the characterization that opposing counsel has offered this court, but it is the one that occurred. And I'll start with the first theme that both of Mr. Cartwright's defense attorneys were effective. There is no better proof of how effective Mr. Cartwright's trial lawyer was than the trial transcripts themselves and the jury's verdict. Mr. Green clearly was prepared to represent his client in this case. He made repeated, focused objections throughout the course of the trial, he cross-examined the government's key money laundering witness so effectively. That could be he did the best he could with the things he had. Their point is that you disadvantaged them by giving them a bunch of information on the eve of trial. So he may have done a B-plus job, but they're saying he could have done an A-plus job if you'd given him the information earlier. So I don't know if that really... Well, they are... There's no ineffective assistance claim here, but they're staying there still prejudiced by the... They are inviting the court to speculate about what type of... Why don't you just explain about the information that you... Why was that okay or why was it not a problem? So very normal discovery process. Initially in a case, the government provides the defense with a big library of evidence. So in this case, we're talking about money laundering evidence, so that's very document heavy. We're also talking about not only a drug investigation, but a tile-free wire intercept investigation. And in this case, there were five different wiretaps. So Mr. Cartwright's trial attorney was given a very large library of evidence that included, you know, many, many gigabytes of recordings. There were also phone dumps in this case, most especially from Mr. Michael Booker, a co-conspirator of Mr. Cartwright. A single phone dump alone can generate gigabytes of data. In fact, I don't know of one that doesn't. So... Is this made at all made available at the outset? Yes. So this is the big library of evidence from which the trial exhibits are called. Are we talking about a library or are we talking about a physical place for the defendant to go review the recordings and the documents? So I'm using that metaphorically now, Your Honor. I just mean there's a large production that's produced to defense counsel and it's a series of productions. So in this case, Mr. Cartwright's trial attorney was given access to that evidence months, years in advance of trial. We're talking two years and four months since Mr. Green first appeared for Mr. Cartwright on the case. Then in this case, as in virtually every other case that I've tried, what the government does is as trial approaches, we identify for the defendant, hey, here are the trial exhibits that we're going to be using and submitting to the jury. We do that because we want to give defense counsel an opportunity to object. Now in any case, absent the most basic traffic stop, felon in possession or drug case, a defense attorney must have previously reviewed the library of evidence or the production of evidence in order to make sense of what's coming in during this work up to trial exposure of exhibits. That's because the defense attorney needs to be able to recognize, okay, these are these records from here. The reason the government produces that information anew in the form of trial exhibits is specifically because we don't want to overwhelm defense counsel by making them go look, you know, by, hey, you need to go find this file over here. We're using pages 1, 3, 5, and 7, but not, you know, all the other ones. We just reproduce, here's what the exhibits are. But in every case, it's very easy for defense counsel who's done the job of investigating the case upon receiving that initial set of disclosures to then identify, okay, here, I see what the government is giving me and what they plan to use. Why would the government wait until the morning of trial to produce the exhibits? We did not wait until the morning of trial to produce the exhibits. Tell me, tell us factually what happened. So factually what happened is we produced pretrial exhibits before the final pretrial conference, which was two weeks before trial. Then between the final pretrial conference, which is March 25 and then April 12, excuse me, it might have been the 28th, we produced refined or updated versions of exhibits based on witness interviews. So what's happening there is after the final. When your trial preparation progresses, you also make final decisions about witnesses, is that? That's correct, Your Honor. And sometimes when we interview a witness in the work after trial, they say, actually, you know, this document or this exhibit is incorrect. It needs to be changed to reflect what's accurate. And then we would make that change and produce it to defense counsel. So in this case, the gigabytes of evidence that is coming before the final pretrial conference, which is still weeks before trial, that sounds large in the abstract because gigabytes is a scary term, but we're talking about, we're producing to him dozens of wire calls. We're producing to him videos that came from Michael Booker's phone. We're producing to him financial records that he'd been demanding. How much of that was new evidence, evidence that was not in the library maybe, as you're calling it? That was all called from the library, Your Honor. And my opponents today haven't identified a single piece of evidence, despite having plenty of time themselves to review the discovery logs of the government, to say, hey, here it was, here's the key piece of exculpatory evidence or the key avenue of impeachment that would have really created the just result as they characterize it in Mr. Cartwright's trial. That's important because, one, it distinguishes what happened to Mr. Cartwright from the key case that they rely upon. So they keep invoking the Garner case on this discovery issue, and that case, during trial, the government, or on the very eve of trial, the government produced a high volume of material to defense counsel. Contained within that was a specifically identified line of impeachment inquiry that defense counsel could not discover because defense counsel was in the act of doing trial. Afterwards, when defense counsel had the opportunity to review that evidence, on appeal, it was represented to this court, hey, look, this is what I could have done differently. And I wasn't able to do that because I was not granted a continuance. And this court found that that was evidence that there had been prejudice by the district court's arbitrary insistence on moving forward with trial when a short continuance wouldn't have allowed for that. That is very different for here, from this case. Mr. Cartwright's counsel is just inviting this court to speculate that maybe things would have gone differently or maybe Mr. Cartwright's attorney would have gone from a B plus or an A minus to an A or A minus job if he'd been given more time. But they haven't told this court what is the smoking defense gun that was not discoverable, and that's important. Now, the superseding indictment added, as I recall, two new claims. That's correct. And that indictment was filed like 25 days before trial. That's correct. Counsel said he simply did not have enough time to prepare a defense given those new claims that had just been raised. So that, I think the district court correctly determined that that claim was not a trustworthy claim. And I don't mean to accuse defense counsel of misconduct at all. He was employing a familiar strategy, which is an effective strategy, which is when you are representing a criminal defendant who is out on bond, almost every time you're in front of district court on something, you say, I need more time, I need more time, I need more time. You're trying to buy your client time before trial. And it puts the government in an awkward position because the more you say that, you make the government rethink all of its discovery decisions that it has to make. If I adopt a very open discovery posture, am I then going to be accused of drowning the defendant in evidence? Or could I be damned the other way if I withhold and try not to drown him, or am I going to be accused later of withholding material? So Mr. Cartwright's attorney knew what he was doing and was doing a very effective strategy of when I'm in court, I say I need more time. But the district court correctly determined that that was not actually true that Mr. Cartwright's lawyer needed more time. And there were two reasons why that was clear. The first has to do with the nature of the additional charges in this case. So the new charges, it was not as if Mr. Cartwright was accused of drug dealing and money laundering and wire fraud and then was all of a sudden 25 days before trial accused of a separate bank robbery. So it was not a different offense type. It was not even an offense that occurred at a separate location. All that was changed was that there was an additional controlled substance added to the set of drug charges in this case. And that happened, that evidence had already been provided to defense counsel months in advance of the final pretrial conference. So Mr. Cartwright was well aware that there was more than seven pounds of marijuana in his basement, 7073 Eastern when it was searched. That is the floor of the home that he stayed in. That is where the office was that contained the firearms. And those firearms, which were the basis of his felon and possession conviction, were also the basis of the 924 suit charge that was added. So this was not a circumstance in which defense counsel was put in the position of having to reorient to new evidence that had not been heard of or really even to new legal theories. They were similar in kind as to what Mr. Cartwright was also facing. And the crux of the government's case, the main focus was still the cocaine conspiracy and the money laundering charges. So I see that I'm about halfway through the time. I don't want to... Address the restitution issue? Certainly, Your Honor. So how much did the defendant know when he pled guilty and what do you need to know? So the defendant knew that he had an obligation to pay full restitution as required by law. That's what the magistrate judge who took his plea told him. That is what his plea agreement told him in writing. And that's what he affirmed he understood by signing his plea agreement and during the plea colloquy. More, he is not entitled to more in order to tender a knowing, intelligent, and voluntary plea. My opponent in this case has not offered any authority either from the Supreme Court, from this circuit, from the rules of criminal procedure, anywhere that states that a defendant must be told as to the upper limit of his restitution in order for his or her plea to be knowing. And that is consistent with precedent establishing that that is not something that's necessary for a plea to be constitutionally permissible. When a defendant goes to trial, typically the restitution is ultimately determined from facts that were presented at trial, right? Not from anything that happens pre-trial. So sometimes, Your Honor, yes, but sometimes no. So even after a trial conviction, what's often happening is now that the conviction has been established, victims in a case are given the opportunity to supplement the record with victim impact statements and restitution claims. So even in a trial case, it's very normal that it's only afterwards that a full amount of restitution can be known. And the defendant here is asking for a global ruling, and by that I mean they are asking this court to find that in all cases, a defendant must be told as to the upper limit of his restitution in order for a plea to be knowing and voluntary. But that is a rule that would have severe global consequences because, as I've just explained moments ago, the normal process is that the full restitution inquiry doesn't happen until after the conviction event has occurred. And that makes sense because often a victim's losses are evolving, so you can imagine a circumstance in which somebody committed a violent crime, you have a victim who is suffering some combination of psychological and physical injuries, it may be the case that even though the victim is diligent and engaged in the trial process, even though the government is diligent and engaged in trying to get information about losses of the victim, medical bills or other types of injuries are not apparent until several months have passed. And so it's for this reason that Congress established a restitution scheme that allows for a restitution hearing to take place not only separate from a plea, not only separate from a trial, but separate from a sentencing. So the district court has the authority to adjourn separately the question of restitution and establish that independent of a sentencing hearing and can even reopen the question of restitution after a defendant has been sentenced. And that's all consistent with the commentary for Rule 11 in which the drafters of that rule acknowledge that the amount of restitution is not knowable often, in many cases, at the time a defendant tenders a guilty plea. Absent authority establishing that a defendant must be given that information in order for a plea to be knowing, the court should deny Mr. Cartwright the relief he seeks on this ground. I want to turn to the chart that opposing counsel was discussing moments ago, the exhibit 58A that depicted Mr. Cartwright with three of his co-conspirators in this case. As on the restitution claim, opposing counsel has not supplied this court with any precedent establishing that prejudice of the type they are asking this court to imagine is a real one that merits relief. So while this court has been on guard against suggestive photos in other cases, it has done so primarily in the context of photos which are inherently prejudicial because of what they depict. So we cited a case that talked about gang graffiti which could have a very prejudicial or create an emotional reaction in the jury or circumstances in which identification is at issue and an exhibit includes an unduly suggestive photo array. But this case here is, or this exhibit here is not even one that unduly suggests that Mr. Cartwright was the leader of a conspiracy. If we had put him on the middle of the chart, I'm sure opposing counsel would be arguing, well, you've made him the center of the action. All the play revolves around him and so that's how you suggested that he was the leader of the conspiracy. Or if we put him on the left-hand side of the chart where Mr. Elan Johnson was listed, they'd be saying, well, you listed him first. And so that's making him, that's unduly suggesting that he had a leadership role here. So really, I think they lack the support that they would need to establish even any prejudice, much less prejudice sufficient to merit reversal. They're also making a new highlighting argument here and they haven't pointed out to the court that all of the people that were on that chart were highlighted in a different color. So it wasn't as if there were three people whose photos were highlighted in one color and then Mr. Cartwright was separated and his was the only one that had a colored border. Each of the people who appeared on that chart were highlighted with a separate color just to distinguish them from one another and make it easier for the jury to determine who it was that was being depicted there. To be granted, for an exhibit to be excluded on Rule 403 grounds, it's not sufficient to show that there is merely prejudicial effect. It's not even sufficient to show that an exhibit's prejudicial effect outweighed its appropriate value. Exhibits are only objectionable on 403 grounds if the prejudicial effect substantially outweighs the prejudicial value of an exhibit. And here what we have is an exhibit that had the opposite, substantial probative value that outweighed the de minimis, if any, prejudicial effect of the exhibit. This is an exhibit that identified key co-conspirators and just objectively listed the number of phone contacts between them, the number of phones that each of them possessed, and which of those calls were tapped wires. As I mentioned before, this is a wire investigation that involved tapping of five separate phones. And so it was important for the jury to understand who is it that's talking on which line, and what types of communications have been happening between these individuals. I want to emphasize, too, that the evidence concerning the charges for which Mr. Cartwright was convicted was, indeed, overwhelming. This is not a circumstance in which there was only scant speculation about whether or not Mr. Cartwright possessed drugs. They found cocaine at his Auto Den car dealership when they searched it. And they found that cocaine at the Auto Den car dealership after listening to a series of wire calls in which Mr. Cartwright coordinated with his drug courier, Michael Booker, to travel out to Elan Johnson, pick up cocaine, travel back, and deliver it at the Auto Den according to the normal plan. That was the term that Mr. Cartwright and his confederates used to describe the delivery of the cocaine in that circumstance. He even agreed on cross-examination that the calls that I just mentioned were, indeed, calls concerning cocaine. And that when Mr. Elan Johnson offered him a quote of $54,000 for a book, or $54,000 for a kilogram of cocaine, Mr. Cartwright himself understood that, in fact, yes, that was an offer of cocaine. Now, my opposing counsel in this case has urged the court, both in its papers and here, to reach a different set of conclusions about the claims that Mr. Cartwright made. But they have not fully accounted for the fact that Mr. Cartwright was assessed an enhancement for obstructing justice because of the perjury he committed while on the stand. It is certainly not the case that the statements of somebody who committed perjury should be the basis for finding that he was granted an unfair trial in this case. And in emphasizing or relying on them so heavily here, opposing counsel has ignored the other evidence in the record that established overwhelmingly that Mr. Cartwright committed the crimes that the jury found him guilty of. Lastly, on the question of ineffective assistance of counsel, I submit to the court that this is not the appropriate time to review those claims. We should wait until there's been a more developed record on that issue via 2255. But I will point out for the court that Mr. Cartwright had a different lawyer for his change of plea. That was a man named Mr. Richard Zambon. And Mr. Zambon, as far as I know, is the only attorney I practice opposite who has been affirmed by this court for rendering especially effective assistance in the context of a plea negotiation concerning a drug defendant. In Logan v. United States, 910F3864, this court singled him out for providing effective assistance in the context of a plea negotiation as opposed to a different counsel of record on the case who did not provide effective assistance. So just by this court's own precedent, this is not somebody who this court need to be at least instinctively suspicious about doing a bad job. But beyond that, the types of objections that opposing counsel says Mr. Zambon should have made are not ones that would have made a difference in Mr. Cartwright's case. So, for example, they point out that the district court characterized Mr. Cartwright's money laundering conviction as a bit of a bonus. And they say, well, it wasn't really a bonus because he obviously got a separate sentence for that. I'm sure the district court understood that. What the district court was just articulating was the fact that this is somebody who did not have their advisory guidelines range elevated by the fact of having participated in two separate criminal ventures, even though he was convicted in those two ventures. That was a significant benefit that defense counsel secured for Mr. Cartwright by having the wisdom to consolidate the two sentencings into one so that Mr. Cartwright's drug convictions did not count against him upon sentencing in his money laundering case. Had that occurred, Mr. Cartwright would have not only had an elevated advisory guidelines range on his money laundering conviction, but the guidelines would have authorized consecutive sentencing. And so the person that they are accusing of providing ineffective assistance was actually one that in all likelihood spared Mr. Cartwright a chance at years extra in prison. I see that my time is out, unless the court has any other questions for me. That's all that I have. They're not. Thank you. All right. Mr. Shuler, you had three minutes to rebuttal, I believe. Thank you, Your Honors. Just two brief issues on rebuttal. First, on the continuance issue, please keep in mind that the timing on when they provided this data, filed these new charges, made this motion was the government's choice. They talk about being put in an awkward position by defense counsel, but they made the choice on the timing of when to file those charges and bring those motions. They say that Mr. Cartwright had the evidence related to these marijuana charges, but so did the government, and they could have brought that charge significantly earlier. And they say that these were based on the same legal theories of liability, but if they were based on the same theories that wouldn't have required a motion in limite to limit substantively new and different defenses, which again, the government chose to bring on the day before trial. And so while they accused defense counsel of putting them in an awkward position, the government put Mr. Cartwright's defense counsel in an awkward position, and they should have understood that bringing these new charges, providing this new data so close to trial would require more time for a solo practitioner to adequately prepare. And that's where Judge Gibbons and Judge Radler, your questions about by weight and going from maybe a B plus to an A plus are important questions for this court to ask and consider. Second, on the restitution issue, opposing counsel says that we have no authority related to our restitution case, but in our briefing, we reference Smith, which is a case from this court that says that when the court was ambiguous as to the amount or manner of determining the restitution amount, that is not enough. And the government speaks a lot about conditions that may not have been apparent at the time, leaving restitution open for conditions and new facts that may be discovered during trial or after the plea hearing through other testimony. But that was not the case for Mr. Cartwright. In Mr. Cartwright's case, both the government and the court were acutely aware that the amount that Mr. Cartwright would be held liable for in restitution was significantly greater than the $15,000 amount that they cited in his plea agreement and in his PSR, because other defendants had been charged and held liable for significantly more in their plea agreement. The government cites no reason why Mr. Cartwright's plea should have been treated any differently, and he should not have been put on notice of the full amount, which was greater than 20 times the amount that was referred to any time the factual basis of Mr. Cartwright's liability was brought up or in any written paper that was presented to Mr. Cartwright. Mr. Cartwright repeatedly expressed confusion, and the court should have known that he was confused. It was not made clear to him, and so we ask this court to remand for further proceedings so that he may plead anew. Thank you. We appreciate the arguments that all of you have given. We're particularly glad to have the students argue. It's one of the things that makes us know that the future of the legal profession is in good hands. Thank you. Thank you.